## OAKDALE MFG. CO. vs. JOHN B. CLARKE.

### MAY 11, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Garnishment. Exemptions from Attachment of Negotiable Promissory Notes.*

Under the provisions of C. P. A. § 601, subsection 11, of exemptions from attachment, including "debts secured by bills of exchange or negotiable promissory notes," the amount due from the maker of an overdue promissory note, to the payee thereof while the note is held by the payee, is not subject to garnishment served upon the maker in another action against the payee.

Sketch of the history of such exemption in this State.

ASSUMPSIT. Heard, on agreed statement of facts, upon certification from District Court.

BLODGETT, J. The question presented by the agreed statement of facts certified to this court by the District Court of the Sixth Judicial District, under the provisions of section 477 of the court and practice act, is whether the amount due from the maker of an overdue promissory note to the payee thereof, while the note is held by the payee, is subject to garnishee process served upon the maker in another action against the payee, under the provisions of section 601, sub-section 11, of the court and practice act, which is as follows: "The following goods and property shall be exempt from attachment on any warrant of distress or on any other writ, original, mesne, or judicial; . . . Debts secured by bills of exchange or negotiable promissory notes."

It is contended, upon behalf of the defendant, that the statute contains no words of limitation, and that, inasmuch as an overdue promissory note is still transferable and negotiable after maturity—*Capwell* v. *Machon*, 21 R. I. 520–522—the statute continues to apply.

The plaintiff contends that, inasmuch as the holder of overdue paper takes it subject to equities between the original parties, such a note is no longer "negotiable" within the meaning of the statute, though conceding that it is still transferable after maturity.

It is obvious that the decision of the question must depend upon the meaning of the word "negotiable" as here used, and this involves a consideration of the legislation of this State relative to such an exemption.

In the Revision of 1745 (p. 302) it was provided as follows, in "An Act enabling Creditors to recover their *just Debts* of such Persons who have *removed* out of this Colony, and of others not *Inhabitants* thereof, or who *conceal themselves* therein, . . . *Provided, Always*, That this Act, or any Thing therein contained, shall not extend or be deemed to extend, to attach any Sum or Sums of Money, in the Hands of any Person who hath given his *Negociable* Promissory Note for the same."

This proviso appears in the same words in the Revision of 1767, page 131.

In the Revision of 1798, p. 211, the provision is thus expressed in "An Act enabling Creditors to recover their just Debts and Demands of Persons who are absent from the State, or concealed therein." . . .

"SEC. 6. *And be it further enacted,* That the same proceedings respecting foreign attachments shall be observed in Justices Courts, as others: *Provided always,* that this act, or any thing therein contained, shall not extend, or be deemed to extend, to attach any sum or sums of money in the hands of any person who became indebted, by bill of exchange, or hath given his negotiable promissory note for the same;" and the same wording is preserved in the Revision of 1822 (p. 161).

In the Revision of 1844, p. 121, the provision is thus expressed in "An Act prescribing the forms of Writs and manner of serving them." . . .

"SEC. 28. Mariners' wages shall not be liable to attachment under this act, until after the termination of the voyage in which such wages shall have been earned; nor shall any debt which is secured by bill of exchange or negotiable promissory note."

The Revised Statutes of 1857, cap. 181, § 2, par. 11, exempts from attachment "Debts secured by bills of exchange or negotiable promissory notes," and such is the language of Gen. Stat. of 1872, cap. 198, § 4, par. 11; Pub. Stat. of 1882, cap. 209, § 4, par. 11; Gen. Laws of 1896, cap. 255, § 5, par. 11, as well as the provisions of § 601, par. 11, of the court and practice act of 1905, *supra.*

Thus for more than one hundred and fifty years the indebtedness secured or evidenced by a "negotiable promissory note" has been exempt from process of foreign attachment, and it becomes material to consider the meaning originally attached to the expression, and then to consider whether that significance has been changed by subsequent legislation. It is well known that at the common law a chose in action could not be transferred or assigned so that the transferee or assignee could maintain an action thereon in his own name. By the law merchant

or the custom of merchants, however, bills of exchange could be transferred or assigned and the assignee could sue the drawer or acceptor in his own name. In *Clerke* v. *Martin*, 2 Ld. Raymond, 757 (1702), the plaintiff relied upon the same custom of merchants in an action upon a promissory note payable to order—"But *Holt* chief justice was *totis viribus* against the action; and said, that this note could not be a bill of exchange. That the maintaining of these actions upon such notes, were innovations upon the rules of the common law; and that it amounted to the setting up a new sort of specialty, unknown to the common law, and invented in *Lombard Street*, which attempted in these matters of bills of exchange to give laws to *Westminster-hall*. That the continuing to declare upon these notes upon the custom of merchants proceeded from obstinacy and opinionativeness, since he had always expressed his opinion against them, and since there was so easy a method as to declare upon a general *indebitatus assumpsit* for money lent, &c., . . . "And judgment was given *quod querens nil capiat per billam*, &c., by the opinion of the whole court."

In consequence of this adverse decision Parliament enacted the Statute "Anno tertio & quarto Annæ Reginæ," cap. IX, taking effect May 1, 1705, wherein this decision is referred to, as follows, in "An Act for giving like Remedy upon Promissory Notes, as is now used upon Bills of Exchange, and for the better Payment of inland Bills of Exchange,"

" 'Whereas it hath been held, That Notes in Writing, signed by the Party who makes the same, whereby such Party promises to pay unto any other Person, or his Order any Sum of Money therein mentioned, are not assignable or indorsable over, within the Custom of Merchants, to any other Person; and that such Person to whom the Sum of Money mentioned in such Note is payable, cannot maintain an Action, by the Custom of Merchants, against the person who first made and signed the same; and that any Person to whom such Note should be assigned, indorsed, or made payable, could not, within the said Custom of Merchants, maintain any Action upon such Note against the Person who first drew and signed the same;' Therefore, to the Intent to encourage Trade and

Commerce, which will be much advanced, if such Notes shall have the same Effect as Inland Bills of Exchange, and shall be negociated in like Manner; Be it enacted by the Queen's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, That all Notes in Writing, that after the first Day of May, in the Year of our Lord, one thousand seven hundred and five, shall be made and signed by any Person or Persons, Body Politick or Corporate, or by the Servant or Agent of any Corporation, Banker, Goldsmith, Merchant, or Trader, who is usually intrusted by him, her, or them, to sign such Promissory Notes for him, her, or them, whereby such Person or Persons, Body Politick and Corporate, his, her, or their Servant or Agent as aforesaid, doth or shall promise to pay to any other Person or Persons, Body Politick and Corporate, his, her, or their Order or unto Bearer, any sum of Money mentioned in such Note, shall be taken and construed to be, by virtue thereof, due and payable to any such Person or Persons, Body Politick and Corporate, to whom the same is made payable; and also every such Note payable to any Person or Persons, Body Politick and Corporate, his, her, or their Order, shall be assignable or indorsable over, in the same Manner, as Inland Bills of Exchange are or may be, according to the Custom of Merchants; and that the Person or Persons, Body Politick and Corporate, to whom such sum of Money is or shall be by such Note made payable, shall and may maintain an Action for the same, in such Manner as he, she, or they might do, upon any Inland Bill of Exchange, made or drawn according to the Custom of Merchants, against the Person or Persons, Body Politick and Corporate, who, or whose Servant or Agent as aforesaid, signed the same; and that any Person or Persons, Body Politick and Corporate, to whom such Note that is payable to any Person or Persons, Body Politick and Corporate, his, her, or their Order, is indorsed or assigned, or the Money therein mentioned ordered to be paid by Indorsement thereon, shall and may maintain his, her, or their Action for such Sum of Money, either against the Person or Persons, Body Politick and Corporate, who or

whose Servant or Agent as aforesaid, signed such Note, or against any of the Persons that indorsed the same, in like Manner as in Cases of Inland Bills of Exchange." · · ·

This act was made perpetual by the statute Septimo Anno Annæ Reginæ, Cap. XXV. In neither act are the provisions extended to the colonies. In some colonies its provisions seem to have been adopted by re-enactment of the colonial assemblies, and in some it was not so adopted. Thus in *Caton* v. *Lenox, &c.,* 5 Randolph, 31, 41 (1827), it was said by the Court of Appeals of Virginia: "The Statute of Anne was never in force with us." And see *Norton* v. *Rose,* 2 Wash. 233–251 (1796); *Davis* v. *Miller,* 14 Gratt. 1–18; And in *M'Cullough, Assignee,* v. *Houston,* 1 Dall. 441 (1789), it is observed by Chief Justice M'Kean, speaking for the Supreme Court of Pennsylvania (p. 443): "Before this act (of the assembly of Pennsylvania) was passed, it appears, that actions by the payee of a Promissory Note, were not maintained, nor can they since be maintained, otherwise than by extending the English statute of 3 & 4 Ann. c. 9. sect. 1. Actions upon Promissory Notes were probably brought here, soon after the passing of the statute, by attornies who came from England, and were accustomed to the forms of practice in that kingdom, but did not, perhaps, nicely attend to the discrimination with regard to the extension, or adoption of statutes. I have no doubt, indeed, that many acts of Parliament, passed, not only before, but subsequent to the union of England and Scotland, have, by the same means, been introduced and practised upon in Pennsylvania; and as experience has proved such proceedings to be beneficial, so constant and uninterrupted usage has given them a legal existence, that cannot now be shaken or destroyed. But the *indorsees* of Promissory Notes, according to the best information which we can obtain, have never grounded their actions against the drawer, upon any other basis than the act of Assembly now under consideration; though, I think, the action by an indorsee, against the indorser, must be founded on the statute of Anne and the usage under it, as no such action is given by the act."

We are unable to find that the Statute of Anne was ever

formally adopted in Rhode Island. It is not specifically included in the list of statutes. adopted and declared in force in 1749 and an examination of the records of every case decided in the Supreme Court of Judicature for Providence County for the fifty years between its organization in that county in 1747, and the year 1798, in order to determine whether it was "introduced into practice in this State," in the language of the Revision of 1798, section 5 (p. 78), shows that in every instance of suit by an indorsee against the maker of a promissory note the action was brought either in the name of the holder as assignee of the payee or in the name of the original payee as trustee to the use of the indorsee, as in other cases of assignment of choses in action. And see Swift's System, Conn. vol. 2, pp. 157, 159 (1798).

By the Revision of 1798 the right of action was given by the General Assembly to holders or indorsees in their own names, as follows (p. 445), in "An Act concerning Promissory Notes":

"SEC. 2. *And be it further enacted,* That a note made as aforesaid, containing a promise for the payment of money only, made payable to order or bearer, shall be assignable or indorsable over, in the same manner as bills of exchange are or may be, according to the custom of merchants; and the assignee or indorsee of such negotiable note may maintain an action against the maker of such note, or any prior indorser, for the recovery of the money due thereon.

"SEC. 3. *Provided, nevertheless,* and be it further enacted, *any thing in this act to the contrary, notwithstanding,* That all actions which shall be brought on any promissory note, payable to order or bearer, made prior to the passing of this act, shall be commenced and prosecuted *in the name of the original payee of such note,* or in case of his death, in the name of his legal representative, otherwise such action shall abate."

The plaintiff concedes in his brief that "It was not until about A. D. 1789, when the case of *Brown* v. *Davies,* 3 T. R. 80, was decided, that it began to be the custom among merchants to allow such notes the added element of 'freedom from equities,' that is, of not being subject to the defenses between the original parties." Their statement appears to be sup-

ported by the observation of Erskine *arguendo*, in *Boehm* v. *Sterling*, 7 T. R. 427, and also Lord Kenyon, C. J., p. 429 (1797). But see also observation of Lord Mansfield in *Peacock* v. *Rhodes*, Doug. p. 636 (1781), which seems to establish the adoption of the rule as early as 1781.

(1)   It is not necessary to determine whether the same incident attached to negotiable paper before maturity in this State prior to the Revision of 1798, *supra*, since there is no contention that such was the case when the exemption from attachment was first created in 1745, and overdue paper to-day is, consequently, within the reason of the rule then established.

The provisions of the "Negotiable Instruments Act," Pub. Laws 1899, cap. 674, are not inconsistent with this view. While not enacted for the purposes for which the action now before the court was instituted, and containing in section 7 thereof this clause, "In any case not provided for by this act the rules of the law merchant shall govern," it also contains the following language in section 55: "An instrument negotiable in its origin continues to be negotiable until it has been restrictively indorsed or discharged by payment or otherwise."

Counsel for the plaintiff have shown much diligence in the citation of authorities upon the general question here raised. An examination of all of the cases upon their brief shows, however, that they were decided either upon statutes differing from our own, or were decided in jurisdictions in which there was no statute upon the question. To the contrary of their contention, and upon a statute closely resembling our own statute, and held by the court to be controlling, is *Eunson* v. *Healy*, 2 Mass. 32.

Our decision is that the garnishee in the case at bar is not chargeable, and the papers in the case will be remitted to the District Court of the Sixth Judicial District, with the decision of this court certified thereon, for further proceedings in accordance therewith.

*Gardner, Pirce & Thornley, and Fred A. Otis*, for plaintiff.
*Doran & Flanagan*, for defendant.